Ms. Ilter, for the Appellant, Mr. Love, for the Appellee. Good morning, Your Honors. May it please the Court, my name is Emmer Ilter on behalf of Appellant Penelope Minter. Your Honors, the District Court's grant of summary judgment in this case for the District was an error for several reasons, and Ms. Minter's case should be remanded for further proceedings. Critically, summary judgment for the District on Ms. Minter's retaliation claim in particular was erroneous, because there are several genuine disputes of material fact on that claim, under which a reasonable jury could find in Ms. Minter's favor. Now, importantly, unlike some of Ms. Minter's other claims which were discussed in the ruling, this claim, the retaliation claim, is not subject to any statute of limitations questions. Therefore, if the Court were to find that there is a genuine dispute of material fact on that claim, which we believe there is, the case must be remanded regardless of how the Court rules on Ms. Minter's other claims involving limitations. Now, Your Honors, looking at the evidence presented in the light most favorable to Ms. Minter, the non-moving party on summary judgment, and drawing all reasonable inferences in her favor, it appears that there was a genuine dispute of material fact. The District Court ruled that Ms. Minter failed to present adequate evidence that a reasonable jury could find under the Adeyemi v. District case, that the District's, quote, asserted non-discriminatory reason was not the actual reason, end quote. In fact, Ms. Minter presented sufficient evidence which was not as- Not enough just to be the real reason. It has to be, also give reason for a jury to believe that the real reason was retaliatory. Yes, Your Honor, that's correct. Though the District Court didn't reach that precise question in the ruling. It did- Well, we're reviewing this de novo anyway, so- Yes, Your Honor. Looking first at the asserted non-discriminatory reason, if you take the District's arguments and explanation for why Ms. Minter was terminated, and without looking at the merits of those contentions and those assertions, they contradict. And that's the sort of evidence under Texas Department of Community Affairs v. Burdey in the Supreme that the reason was a pretext. They have to contradict in a way that suggests it's a pretext. So, in what way do they contradict that suggests that the real reason is retaliation? Well, Your Honor, the first part of the test is the contradiction, and so there's a showing that there- On summary judgment, the District is saying that Ms. Minter was terminated because she provided a certification from a Dr. Batibs, and on that basis, the District asserts that she was indefinitely unable to work. That's the June 20th certification, Joint Appendix 284. But if you look at the testimony of Ms. Beverly Fields, the Chief of Staff of the District's Office of the Chief Medical Examiner, where Ms. Minter worked, who in her testimony says she was directly involved in the decision to terminate, she says, quote, we never got anything, end quote, to explain Ms. Minter's absence from work. That's at Joint Appendix 278. And asked further about the reason for termination, her reason given is, quote, we have to have work done. We're not getting any response from the employee for months, and the employee is- Okay, so they were trying to get some medical records, right? And they didn't get them, right? And time passed? Well, Your Honor, there- In other words, I'm trying to find the contradiction. So, Your Honor, there- One contradiction is that they're saying they didn't get- Ms. Fields is saying she didn't get anything, and they didn't know why. She also says later that they didn't know why Ms. Minter was absent, and so the work wasn't getting done. They asked- In the deposition, they asked, quote, question, was there any other reason she was terminated? Ms. Fields says no. That's at Joint Appendix 283. But the district in its brief is saying the reason she was terminated was because of the certification she gave that allowed them to decide, in their view, that Ms. Minter was totally disabled indefinitely. But Ms. Fields, who was directly involved in the decision, is saying we didn't get anything. Now another contradiction is Ms. Fields testified that the decision to terminate Ms. Minter was made collectively, quote, by Ms. Fields herself, Ms. Sharon James, who was Ms. Minter's supervisor, the general counsel, and Ms. Charlene Williams, who was the ADA coordinator. That's at Joint Appendix 282, 283. Yet if you review the deposition transcript of Ms. James and Ms. Williams, each of them expressly disavows any involvement in the decision. Ms. Williams was asked in her deposition, quote, were you involved in the decision to terminate Ms. Minter? And she responded, answer, no, not to make the decision. That's at Joint Appendix 228. Yeah, she didn't make the decision. You don't see a distinction? Between her making the decision and the reason? The final decision and being involved in the process of determining whether or not this would be an appropriate path to follow? Well, Your Honor, review of the standard under Texas Department of Community Affairs shows that the assessment is whether the employer's proffered explanation is unworthy of credence. And these are the sort of inconsistencies in the story. Why is this inconsistent? On the one hand, as you can see, she hasn't been to work in a very long time, correct? That's correct, Your Honor. And she had not provided medical information in a very long time, correct? That's not correct, Your Honor. Where is the evidence that? Your Honor, Ms. Minter did testify that she was, that she had, that the district had access to her medical records through the workers' comp process. She was in a new office, the Office of Medical Examiner. As of May of 2006, yes, Your Honor. All right. And that office, the ADA coordinator, wanted medical records and asked Mrs. Minter for them. Yes, Ms. Williams, in the December 1st, 2000... So, the Chief Judge's question is pointing, I think, to this gap from the request. And the district government as a whole, the Department of Human Resources may have had the records, but also the medical examiner apparently didn't have them, or at least Mrs. Williams didn't have them, and she wanted them. Well, Ms. Williams, in December 2006, asserted, she questioned whether Ms. Minter even had a disability to begin with. This is before, that was before she had the accident, right? That was after she had the accident, Your Honor. So, to give a quick timeline, Ms. Minter... No, but let's be clear. I mean, you can't take these out of context. She's in a new office. Mrs. Williams is the person she has to deal with. And Mrs. Williams, I agree, Mrs. Williams' testimony is, I don't know if you're, I don't even know if you're disabled. So, she wants some medical records. Well, Your Honor, one point I will add, there's a factual dispute on that, because Ms. James testified in her deposition that she was aware of Ms. Minter's sarcoidosis, her disability. That's in Joint Appendix 202. I understand, but Mrs. James is not a medical doctor, and the disability cannot be just based on another employee's say-so. Isn't that what Mrs. Williams is trying to just document? Well, Your Honor, I agree. She wasn't a medical doctor. Ms. Williams isn't a medical doctor either, yet. Well, that's why she wanted medical records. And she requested all the medical records ever, so that she could personally assess if Ms. Minter had a disability. Ms. James also testified that she had told Ms. Williams, Ms. Fields, and Dr. Pierre Lewis, the head of the office, about Ms. Minter's sarcoidosis back when she was interviewing. That's at Joint Appendix 207 through 211. I mean, it's unfortunate, but at least the way I'm reading the record is, Mrs. Minter was in one part of the D.C. government, and over the years had established a working arrangement. Then she gets a promotion, and she's in another office. And that office wants to document whatever's going to happen to her. And this person with whom she had this relationship is no longer around. Well, that's the reason Ms. Williams was giving for denying the accommodation in December. Well, I mean, what I'm not clear about your argument is, are you saying Mrs. Williams had no right to request these records? Well, the government certainly had a right, the district had a right, to make reasonable requests. But to request this testimony from Ms. Minter that the first meeting, well, it wasn't the first meeting, but the meeting where she requested an accommodation on December 1st and was denied was a hostile meeting. Prior to that meeting, Ms. Williams had become angry with Ms. Minter because Ms. Minter had asked around in the government as to what options were for accommodations. This got back to Ms. Williams. She was upset to begin with. What does this have to do with my question? Well, Your Honor, it goes to the question of whether the request for all medical records was a reasonable request made in good faith. My question was, did not Mrs. Williams have the right as the ADA coordinator to ask for these records? Mrs. Minter didn't argue that she didn't have the right to ask for those records. No, the argument isn't the right to ask for any records whatsoever, but the request was for all your medical records, give them to me, Ms. Williams, not a physician, and I will decide if you have a disability because in the December 1st meeting... I mean, looking at Mrs. Williams and Mrs. Minter acknowledged that she had a letter earlier that for some reason she didn't give to either Mrs. James or Mrs. Winter, Mrs. Williams. Mrs. Williams, yes, Your Honor. And it's not clear why she didn't give that. And so what I thought was happening is in order to give Mrs. Minter what she was requesting, Mrs. Williams was asking for medical records that basically would say Mrs. Minter has some type of condition where she can work sometimes, but she needs extended periods of leave because of pain, et cetera, and she ought to be given this type of schedule. And Mrs. Williams, from all I gather, had no such medical information. Well, Ms. Williams, contrary to what she asserted in her deposition that she didn't even know what Ms. Minter's disability was, Ms. James testified. I told Ms. Williams what the... Do you understand? We've been through this. Mrs. James is not a doctor. Mrs. Williams is not a doctor. But she's the one who has to sign off on whether Mrs. Minter can have this relaxed schedule. Yes, Your Honor. And she needs some documentation to approve that. Well, she may, Your Honor. And she received documentation through the workers' compensation disability process. Ms. Minter was examined by the district's claims examiner in April 2007. They said she's ready to come back to work. That's what he said. That's right. So now, if they're going to go in the opposite direction, doesn't Mrs. Williams have a right to request some medical information? Well, Your Honor, our position... To support Mrs. Minter's request. She certainly may have the right to request that, but that right and request has to be viewed in the context of what else was going on. What else was going on? Well, there's testimony that there was some hostility there, that even at the first meeting on December 1st... I don't know what... I understand your point about hostility, but the employee is trying to get a special arrangement. And if she thinks that Mrs. Williams is too hostile, she can file a complaint with Mrs. Williams' supervisor. But that's not the issue here. The question is, she's seeking this disability. Right? Well, that's right, Your Honor. As far as she is seeking the disability, now... So is the implication that a less hostile person never would have asked for medical records? No, that's not the implication, Your Honor. But the request, again, was give me all of your medical records ever. It wasn't give me... From birth until... I mean, I understand you can read it that way, but would a reasonable jury think that's what she was asking for? That she wanted something that would document the request that Mrs. Minter was making? Well, Your Honor, given... Again, given the context and the other evidence here, the evidence surrounding the termination, the evidence surrounding the denial on June 1st, and drawing all reasonable inferences in Ms. Minter's favor at this point, and viewing the evidence in the light most favorable to her, there is evidence to show that, you know, the request very well may not have been made in good faith. And we... Certainly, this Court doesn't have to reach the merits of that point because this is an appeal, but... Let me make sure I understand your theory on retaliation. The way you seem to set it up, I want to make sure I heard you correctly. When the Chief Judge asks you, where is the connection, you seem to say that in the city's motion for summary judgment, as distinguished from the district court's ruling, they asserted that the nondiscriminatory reason was that she couldn't work because the doctor said she was disabled forever. Correct. And, in fact, you're saying, in all of their testimony, they had argued not that, but they had argued, we never got anything, we asked for something, never got it. And, in truth, they had gotten something. Fields certainly had something. And what we think is that disparity is the material fact of the dispute. They've come to summary judgment. They're only arguing not that they couldn't get anything. I want to make sure I heard you correctly. Yes, Your Honor. They're arguing not that they couldn't get anything, but rather the doctor said she couldn't work. And that's the disparity that suggests retaliation as far as your concern. Is that right? Yes, Your Honor, that's correct. In their motion, they are not talking about what we are now talking about. They were talking about, in their motion, which the district court bought, if I'm right in hearing you, they were not resting on all of these other matters. They switched. And you're saying it's obvious why they switched, because they couldn't support what's now being argued. Indeed, they did have knowledge. Is that your point? Yes, Your Honor, that is the point. What's the evidence that they had knowledge? The evidence that they had knowledge is first... You're relying on Fields, that it emanated from Fields. Fields said she didn't get anything. What's the evidence that she did get something? Well, the evidence is the district doesn't dispute that they received on June 20 the certification from Dr. Batibs. And that's what they point to. June 20, 2007. Yes, Your Honor. That's the one that says she can't work. That's right. And that's the reason they gave in the summary judgment brief for termination. I'm sorry. I thought... So when you say they were given something, you mean that disability certificate. That's correct. And they were receiving, just to be clear, they were receiving information through the workers' comp process that was conducted by the district. Well, the question is, who's the they there? You don't have any evidence that anybody who actually fired her got that information, do you? No, Your Honor. But it was the district. Well, yes. It's a big district. But that doesn't mean that any of them got it. And you don't have any evidence that the decision-makers actually got it. Well, we have evidence. Ms. Fields sent a letter on May 7, discussing the disability claim. That's Joint Appendix 72. Ms. James sent Ms. Minter a letter on April 5, stating, on February 26, you left me a voicemail message indicating that you were unable to come to work due to illness associated with the injury. I have since that date received numerous messages indicating that you were unable to report. Well, Fields said at some point, 2-82, that she may have received the medical stuff, but she didn't look at it. And then she says, if it was received, I believe it wasn't enough, was the statement she made. Again, suggesting that that was not the reason for termination. I don't know. I guess I'm having trouble seeing this as inconsistent, even in the summary judgment motion, which is approximately the same thing that Ms. Fields testifies. She stopped coming... This is, I'm reading from the summary judgment. Oh, no, I guess I'm not. What page is the actual... Do we have the actual summary judgment paper that you're talking about? Yes, Your Honor.  In the district summary judgment... The JA page, that's what I'm looking for. It is... Well, it's not in the joint appendix, their brief. It's not in the joint appendix? Their brief isn't. The district summary judgment brief isn't. So I can't give you a joint appendix side, I can give you a page side. A page side of... Of their summary judgment brief. You say that what they said in the summary judgment is inconsistent, right? And I'm trying to find where that is. You're saying it's inconsistent with what their testimony was. Correct. They were resting on this argument that they had a testimony, we never got anything, we never got any responses. That was all there, but that's... You're saying in the summary judgment motion that's not what they rested on. That's correct. So the only evidence I have of what it says in the summary judgment motion is in Judge Cooper's decision, at JA 313. And it says, according to... And it cites the plaintiff's opposition, which I take as what you're talking about, right? And it says, when the district had a legitimate, non-discriminatory reason for firing, she effectively abandoned her job. That's the reason they gave. And that is the same as what Ms. Field says. She stopped coming to work after February 28th, and by April 28th, she'd used up all of her sick leave, and leave authorized, notwithstanding many requests, she'd supplied no medical documentation. During that period, she didn't. Until she produced the disability certificate, which said, declared her totally disabled. So that is exactly what Ms. Fields is saying, that there was a long period in which they got, she didn't come to work, in which they didn't get any information about why she wasn't coming to work. What's the inconsistency? Well, Your Honor, here they're asserting she abandoned her job. She did not abandon her job, and they knew she didn't abandon her job. By which they mean the next sentence, she stopped coming to work, and she supplied no medical documentation to justify her extended absence. And that is exactly what Ms. Fields says. What is the inconsistency? Your Honor, because they did receive the documentation on June 28th. Not until June, right. That's right, when they terminated, the next month. That's after four months she's out, and that's her leave. That's right. They don't say that we terminated her, I mean, I think it seems obvious that they could have terminated her, but it all seems, even if they terminate her for a combination of the fact that she didn't give any information until June, and when she finally gave, and didn't show up, and when she finally did give it, it said that she couldn't work. Even if there's a slight inconsistency, it's not enough of an inconsistency to suggest that the real reason is they were retaliating against her for her disability. That's the problem. Your Honor, at the same time that Ms. Minter sent in that certification, she called and said she hoped to be back in September. She had not been present since February, they have no information from her until June, and what they do say is in June it's indefinite, and then she says she hopes to be back in September. When did you say September? September, two months later. So that means from February to September she hasn't been working. But to be clear, Your Honor, from February through when she provided that certification, she was out on a workers' disability workers' comp issue, so they knew why she was out. They sent her two letters, April and May, saying that they know why she's out. So to assert here that she abandoned her job is not accurate. There's at a minimum a dispute as to whether she abandoned her job, and evidence has been shown that they knew where she was and why she was out. Now they may have requested... And they didn't get a response. Well, Ms. Minter did call them, and they had that conversation on June 1st after she received... Until June, that's odd point. They knew, I mean, presumably they had her home address. Presumably, and they sent her these two letters and she followed up with them. So your case is that the district gave conflicting reasons for terminating, and therefore they terminated her because she was disabled. Well, that's not the whole case, Your Honor. I'm taking it a step at a time. That's one argument, right? That's one argument. The following argument is beyond that, Ms. Minter presented evidence that the termination was improper and retaliatory. Well, she's on stronger ground, isn't she, if she has some supporting evidence for that. That's what I was focusing on. Supporting evidence for retaliation? For the motive? That she was fired because she was disabled. Well, Your Honor, typically, my understanding from reviewing case law is in a case like this, there's rarely a smoking gun, there's rarely someone... I'm trying to give you the benefit of all inferences, counsel. This is a friendly question. I'm trying to understand your arguments. Alright? That's one theory. That these conflicting descriptions show pretext, and that in fact they fired her because she was disabled. Yes. That's your bottom line. That's one argument, yes, Your Honor. And what's your second argument? Well, the second argument is, putting aside the conflict, looking at the substance of those reasons, there are some descriptions... What is the conflict? What's the second reason? Well, the second reason is the testimony and the evidence pointed to by Ms. Minter that there was a different reason for termination, which was that she... Counsel, we've been through your argument that they gave different reasons, and that you say is evidence of pretext. Sufficient for a reasonable jury. And so what is your next argument? Beyond the retaliation claim, we could turn to, uh, there was no discussion in the district court's ruling on Ms. Minter's failure to accommodate claims relating to June 1st, 2007. Yeah, could we, just so, just now we do need to talk a little bit about timeliness, just so I know exactly what you think is the time of the claim. So in your brief, you say it seems like you're saying that we should be counting this from June 1st, um, from that June 1st, uh, meeting or telephone call with Williams or later. Is that right? Well, that's the, the, to be clear, the failure to accommodate claim is based on two denials. One denial was December 1st, 2006, and one denial was June 1st, 2007. I'm sorry, so it's either December 1st or February 2007. Those are the dates of the denial of accommodation. June 2007, Your Honor. The phone call on June 1st, 2007. So it's June 2007, December 1st, 2000, um, when was the other one? December 1st, 2006. When she filed the EEOC claim. That's correct, after the meeting with Ms. Williams. And each of those is an actionable, independent discriminatory act because there was a request and denial each of those dates. Okay, so that means you have to show that she was a qualified person with a disability as of December 1st, 2006. Yes, Your Honor. And June 1st, 2007, right? That's correct. Okay, and in light of the opinion of her doctor that she was totally disabled, what is your evidence that she was qualified? Well, Your Honor, first just to know... As of September. December 1st. As of December or June? No, his letter was that she was disabled as of September when she had the accident. Which was before December. Yes. Well, Your Honor, one key piece of evidence is that Ms. Mintzer performed her job duties after September. So she performed the job duties without an accommodation both before her injury in She was going to work. That isn't disputed by the district. Even district personnel have testified to that effect. She... If you look at Joint Appendix 121 169 to 170, there's discussion of Ms. Mintzer... I'm sorry, what page? 121 and also 169 to 170. Whose discussion is that? That's Ms. Mintzer's discussion. Her testimony that she was at work during that period after her injury, September 2006 through the end of February 2007. She had some absences in there. She did also work a full-time... Her claim is not that she can work full-time. She can work full-time sometime. Yes, she had worked full-time when she had to. To show that... Not when she had to. When she was able to. Her whole claim is that she I will not try to repeat the term, but she is in great excruciating pain and therefore cannot come to work. And this is episodic. That's correct. And she needs a flexible schedule to accommodate that. Yes, there's the flexible schedule request and there's also the request to work from home on occasion. So those are the two different accommodations that Ms. Mintzer requested. And as you noted, her sarcoidosis and the related arthritis and other things caused joint pain and muscle pain, fatigue, but going back to Chief Judge Garland's question, we have the testimony... It's the work injury that's the problem, not the sarcoidosis. For which purpose, Your Honor? Well, for any purpose, because if she wasn't turned down until December 1st, by which point she had not only the sarcoidosis but also the work injury, we have to evaluate her, the question of whether she was qualified as of that date, right? Yes, that's correct, Your Honor, and she testified that she was working as of that date with her injury. So that, at least for purposes of summary judgment and a reasonable jury being able to find in her favor, does show that she, on that date, was a qualified individual with a disability, or at least that they could find that way. Even in light of the doctor saying that she was totally disabled? Or in light of her own doctor saying that she was totally disabled? Well, Your Honor, we have the doctor's note, and the doctor's note the district asserts that there's only one way to read that statement totally. And the district court says he gave the plaintiff an opportunity to offer another interpretation and there was none. Well, Your Honor, there was Ms. Minter... Is that finding clearly erroneous? In our view, it is, Your Honor. Well, why is it clearly erroneous? Because Ms. Minter testified that she was able to perform the job duties as of the time... So her own doctor, she was impugning the integrity of her own doctor? Your Honor, I wouldn't say we're impugning his integrity... Well, she submits her own doctor's statement to the city. That was when she received a letter saying, you must send us something within a week or you will be AWOL and you will be terminated. That's long after they asked for her records. At any rate, she submitted this statement. So, how can she attack it? If it's her own doctor? Well, Your Honor, she did at the same time it was given call them and say, I hope to be back in September. We also have our expert witness Dr. Efthimo, the medical physician, noted that it is difficult to assess recovery time for these sorts of injuries. The combination that Ms. Minter has, that she has her pre-existing condition, that she has her injury from falling. Did the district have that statement? Yes, Your Honor. That's a joint appendix. When did they get that information? Oh, I'm sorry. No, the district didn't have that. The district court had it. Yes, but is that... Doesn't the district have to know that the person is a qualified person with a disability? To have somebody testify after the fact that she was really qualified when the only information they have is from a doctor at the time who says she's totally disabled. Is that sufficient? Is that even relevant? Well, Your Honor, there's an inconsistency because they knew she was qualified because she was doing the job for several months. And so this statement that you've cited, the statement from Dr. Batteeps, comes much later, as Judge Rogers noted, in June. So at a minimum, they knew there was an inconsistency at a minimum because they knew she was at work. So they knew that her doctor thought she was indefinitely disabled.  No, that's what Dr. Batteeps' letter told the district in June of 2007. That's correct, but that was after they... And that is the only medical information that your client, that the plaintiff provided in response to Mrs. Williams' request for medical records. I'm just trying to get the facts here from the record. Well, Your Honor, taking that from the lens of the failure to accommodate claims we have, ultimately... Here's my point. I've got terrible pains. I need to be out from work a lot. And I have a job with the city. And they want my medical records. And so when I give them some records, my own doctor says I'm indefinitely disabled. What's the city supposed to do then? Well, but that's about the retaliation claim, Your Honor. The failure to accommodate... I'm trying to ask you a very direct question here. What is your understanding of the law as to what the district does then? With respect to the retaliation? With respect to Mrs. Minter. She's been out from work all this time. They haven't gotten medical records they requested. And she sends them a medical record from her doctor saying she's indefinitely disabled. Well, if we look at the interactive process which is raised in the briefing, at the same time they received that documentation, they heard from Mrs. Minter saying, I'm planning to be back in September. I hope to be back in September. You like to move the chronology around a lot. But here you are a district official and you get a letter about one of your employees from your employee's own doctor and your employee hasn't shown up for work and her doctor says she's indefinitely disabled. What are you going to do with her manager? Her supervisor? I won't stand in the shoes of her manager, Your Honor, but... I'm asking you to for this hypothetical. You seem to think that the district can just ignore this. No, Your Honor. They could have followed up and said, why are you telling us that you're going to be back in September and you give us this short note that says totally disabled indefinitely. What does that mean? Does indefinite mean permanent? Does it mean two months? Does it mean... They've asked your client to respond over a period of months. She hasn't responded and when she finally does, you know, she's been out a long time. And now her doctor says she's permanently disabled. To be clear, they were receiving information through the workers' compensation process. She went to see Dr. Leavitt. Her doctor, unlike the city's doctor, says she's totally disabled. Alright, and he's focusing on this workers' compensation accident in September. That's the state of affairs facing the city. Are you saying they can't retroactively use that doctor's certificate to justify their failure to accommodate because she was working? That's correct, Your Honor. That's why I was trying to clarify the distinction between the failure to accommodate claims and the retaliation claims. The fact that the doctor's certificate came later has nothing to do with their failure to accommodate someone that you're arguing. They had reason to know had issues and they couldn't have assumed she was totally disabled. That's correct, Your Honor. And the testimony shows that on those two dates we've been discussing, December 1st and June 1st, the denial was made. Ms. Williams both times denied the request for a reduced time schedule. No, that's not quite accurate, is it, counsel? Mrs. Williams put in writing what her position was. You're referring to her December 5th email? The December 5th email where she discusses... What was the date of the first meeting? December 1st, 2006. Then there was a subsequent email from December 5th. I know. I thought you said they had met before December 1st. Well, they have, but we're not tying our failure to accommodate claim to prior meetings. Why did she meet with Mrs. Williams before? I'm not saying that she met before, but there was some... Well, you said it, counsel, and I'm just trying to find out when she met. She met with Ms. James, Your Honor. No, Mrs. Williams, the ADA coordinator. I don't believe... If I said she met with Ms. Williams before that, I may have misspoken. So I apologize for that. So the first time she met with Mrs. Williams was December 1st? Yes, I believe so. At a minimum, that's what our failure to accommodate claim for that for December... And so the same day she files the intake questionnaire with the EEOC? Yes, Your Honor. And on December 5th, Mrs. Williams sends an email? That's correct, and that's about a subsequent meeting that Ms. Minter was in her infant mortality review meeting for work and ran late to her meeting with Ms. Williams, and Ms. Williams accidentally sends Ms. Minter an email and it's noting that Ms. Minter didn't show up to this... I don't think it's accidental, Counselor. She sent her an email saying, we had this meeting, you didn't show up, let's continue talking. Do you know what JA... I will identify it. There it is. I have my record. Joint Appendix... I didn't bring my record with me. Here it is, Joint Appendix 235, Your Honor. And the email I was referring to, which appears to have been an error, is from Ms. Williams to Ms. Minter. It's the second email from the bottom and it says, FYI, this is for your records, in case Penelope approaches you to complain that she cannot get any help. She did not come to our meeting as requested. So that's the email, Your Honor, Judge Rogers, that I was referring to. You said JA 205? 235. Yes, Your Honor. What's the one at the very bottom? This is the December 4th one? Yes. That says, I cannot answer the question without having knowledge of your claims and your doctor's recommendations. That's why I'm encouraging you to meet with me. After I learn what your claims and accommodations are, I'll be better able to answer your question. So doesn't that suggest that there isn't a decision yet by December 4th? Well, that's Ms. Williams' characterization, but if we look at Ms. Minter's testimony at Joint Appendix 150, she says specifically she's discussing the conversation with Ms. Williams What page is that? Joint Appendix 150, Your Honor. And this is in relation to the December this is the December meeting and she says regarding Ms. Williams, and she went on to tell me that was the time when she went on to tell me that you know this wasn't a reasonable accommodation and how do I know you really even have a disability? Bring me all your medical records and I'll go through them. So that statement this isn't a reasonable accommodation doesn't sound like the statement of someone who is awaiting further information, or at a minimum a reasonable jury could interpret it that way and drawing the reasonable inferences for Ms. Minter and viewing this in the light of Ms. Minter most favorable to Ms. Minter who is not the moving party this is another piece of evidence in support of the fact that there was at least there's a reasonable jury could find that there was a denial that day, on December 1st Based on the statement that she wants more records? Well, Your Honor, based on the statement this wasn't a reasonable accommodation and how do I know you really even have a disability? There isn't a statement let's discuss a reasonable accommodation or what an offer as suggested by the interactive process what could be other reasonable accommodations. She stated according to Ms. Minter this wasn't a reasonable accommodation. Where's the working She did take off several weeks between December and January, right? That's correct, Your Honor. So where's that thing? And then stop coming in sometime in February. I think it's around JA 205 This is James' testimony. There is also Joint Appendix 53 Ms. Minter is asked during this time from June to July through September were you working full time? Yes. That's through September. Right, and then were you out at least we know or you said in December 2006 for two weeks and Ms. Minter says I think it was a little more than two weeks but somewhere around that, a few weeks, yes. So there hasn't been any testimony. There's a testimony that she was working and a qualified individual between September and December. Well, so here Joint Appendix 53 Hold on, let me just see. I'm sorry, I'm a little slow. What page of the transcript? So this is page 245. This is the small transcript and she's asked Ms. Minter is asked after you were out for the two or so weeks in December 2006 did you come back to the office? She answers yes and she was asked and at that time were you working full time? I'm sorry, where are you? At the page 245 on JA 53. That's the bottom square? Yes, the bottom square, Your Honor. Okay, and that's again that's about what happened in December, right? After December? I was asking between September and December. Well, I'm not sure that there's a specific citation for that period but again, she had already suffered the injury in September so there hasn't been any evidence to show that she was out between September and December so she wasn't working a full time schedule, Your Honor. That wasn't an allegation that was made to my knowledge. I see that I'm out of time so pending any further questions. Further questions? We'll hear from the District. Good afternoon. Richard Love for the District of Columbia. I'd be happy to discuss the merits but first I did want to briefly address the timeliness issue because we believe that Ms. Minter's claims are time barred. The allegation that in June 2007 there was a telephone conversation where Ms. Williams repeated the same conversation that she had with Ms. Minter back in December doesn't extend the limitations period. As this court concluded in Long v. Howard University where it held, to the extent that the actions merely reaffirm any university action denying Long's request, the District Court properly explains such claims are barred. This court went on to reference the Supreme Court case, Delaware State College v. Ricks where the court made clear requests to reconsider decisions already made cannot extend the limitations period applicable to the civil rights law. Ms. Minter's own testimony is that this conversation in June was a repetition of what had been allegedly requested and denied in December. Her testimony is Ms. Williams repeated to me OCMA doesn't have any part time positions so you can't because I went through the same scenario that I had conversations that I had with her back in the fall and she repeated those. There's a lot more that you have to do to get to where you want to get besides just picking the December date, right? Yeah. And so we think her claims are time barred. It's not time barred just because she found it in December. We have the problem of whether the claims are told during the administrative remedies, etc. under the Rehabilitation Act. Right, that's correct. We do have this court has not addressed whether or not exhaustion is required under the Rehabilitation Act. We would as the district court point to the decision in Adams and other cases, Breed, a Third Circuit case which found that exhaustion wasn't required. There is obviously a tension between two sections of the Rehab Act but I think the court in Adams and the cases that it cites properly resolve those tensions by concluding that the word standards is really referring to standards of liability that Congress was interested in ensuring that the liability standards were the same and if it wanted to include the powers, remedies, and procedures it would have specifically stated that. I think all of her claims are time barred including the retaliation claim. We advance the position that that claim was forfeited and the response is at least as I perceive it in the reply brief is well it doesn't really matter because the claims are timely under the June 2007 telephone conversation but they're not because merely repeating that conversation doesn't restart the statute of limitations. I don't understand. Why is the retaliation time barred? It's our position that it was forfeited. That's not time barred. Well they never made any argument in response to the district's timeliness. She wasn't fired until she wasn't terminated until July of 2007. Isn't that what the retaliation depends on? That's correct. And she filed her clear EEOC charge in October that year. Yeah, well, but if the statute of limitations I mean exhaustion isn't required so I don't know what the relevance of the October 19th 2007 charge would be to the Rehab Act claim. I just don't understand what you're saying that retaliation is time barred. Well, I think the district argued that there was not a timely claim under any of the counts of the complaint. You may argue that she's not showing retaliation. What she points to is enough, but I don't see how it's time barred. Well... I'll cite something, I'll look at it, I just don't see it. You haven't cited anything. You may disagree with the suggestion of this retaliation, but that's a different argument. Absolutely, and I agree, and I'd be happy to address the merits of the retaliation claim. But it was my understanding... What is the statute of limitations is three years, right? That's correct. It would be timely had it been argued, but we believe it was not argued in their promised language. That's correct. That was my point. But I leave that to the court to review the record. That's my understanding. As we said, we don't think the December 1st charge is a charge or, as the district court correctly found, manifests an intent to file a charge of discrimination, so that wouldn't save Ms. Minter's claims from the time bar. Is this Holowicki theory, is that right? Yes, that's correct. But the intake questionnaire is different than the one they were looking at in Holowicki. The intake questionnaire is different than the one they were looking at in Holowicki. And this one does say... I must say the EEOC has done its best to make everything confusing for everybody, but it does say organization against which this charge is being filed. That's what it says as the heading. And then it says other employment organization you want to include in the filing of this charge. Both of those sound a lot more like this is the charge, and different than what the Supreme Court had in front of it in Holowicki. The form may be, but again, the EEOC did send a subsequent letter in April of that year with an enclosed charge of discrimination, told Ms. Minter to send it back, warned her of the time bar. That's what was sent back, but not until October. Moreover, this does fit with what the Supreme Court in Holowicki said. One of the forms, and I understand your point that it's a different form, its purpose is to facilitate pre-charge filing counseling. And that's exactly what Ms. Minter requested here. She wrote on the end of the form that she wished to consult with an EEOC specialist regarding the possible filing of charges. That's why I say it's confused. It's got a little bit for everybody. I do want to move on to the merits, and that is the point that Ms. Minter is not, and a reasonable jury could not find that she's a qualified individual. The six months, at minimum, that Ms. Minter stopped working, and that's from the end of February through what she said her hope was to return in September, and her hope was qualified, saying depending on present treatment, that six-month period is beyond a reasonable amount of time to maintain a non-performing employee. What about this argument? I must say I didn't understand from the briefs, but argument that in December when she was denied accommodation, at that point she had been working. Well, I think she needs to show even if she, you know, one, she was taking, as you said, she took at least, you know, two, three weeks leave between December and January. She did come back. But if the date of the refusal of the accommodation is December, if that meeting is the date of the refusal, I'm not sure whether it is. There's obviously an argument that it isn't, but if that's the date, then what about her claim, although I guess there's no evidence that she was qualified at that point? No, I don't think there's any, I mean, I think there's an issue as to her qualifications, but I don't think you can turn a blind eye to the six months that she simply stopped appearing. And even the EEOC's own guidance, which Mitch relies on heavily, says, you know, that beyond six months is beyond a reasonable amount of time to wait for a non-performing employee. You don't have to answer this question if it's going to hurt your case, but... This case looks like a failure of communication. This woman had been working for the city for decades. She'd been performing basically the same type of work. Then she gets a promotion in a different office, and the person who was most familiar with her working schedule arrangements was no longer a D.C. employee. And so this new William steps into the picture. And Mrs. Williams essentially wants to start from ground zero. I need your records, you know, I need to understand what's going on. And as counsel says, taking the evidence most favorable to Mrs. Minter, she and Mrs. Williams sort of hostile situation. The city, Mrs. James, her... Was she her supervisor? Yes. She knew of Mrs. Minter's medical, at least some medical problems that caused her to be absent sometimes from work because of the pain. They knew where she lived because they were communicating with her. And so far as this record indicates, Mrs. Minter is not... Well, I don't know. I mean, the D.C. doctor said she's able to return to work, and she never returned. Then her own doctor comes in with this letter that she's totally disabled. I just wonder whether or not this couldn't have been handled so much better. Now she's totally disabled. That's one thing. But somehow the communications fell off at some point. Now either Mrs. Minter is in such agony and pain that she can't pick up the telephone and talk to Mrs. James and tell her what's going on or write a letter to Mrs. James or Mrs. Williams. It's just not a happy record. Let me try to put some of that in context, particularly in terms of the promotion. I think the record clearly shows that Mrs. Minter had been in a 32-hour-a-week schedule. It was affecting her pay and benefits. She applied for a full-time position, and she was offered that full-time position. That full-time position was a different position. It was as the coordinator for the Child Fatality Review Commission. It required her to have day-to-day management of that function. It required her to attend meetings. And so she's not in the same position. She's in a different position. Yes, Mrs. James was familiar with her from her prior detail, but Mrs. James testified that once Mrs. Minter stopped coming to work after the 26th of February, that she only got messages when she wasn't at work as to what Mrs. Minter's situation was. So I wouldn't disagree with Your Honor that communications obviously could have been better on both sides without casting blame one way or the other. But I think the bottom line is, Mrs. Minter stops working for at least six months. Is your six months including the two months when I hope to return? Yes. Because she says she won't be at best. Her hope is she'll be back in September. That's a six month period. And if the Court looks in a case from the Tenth Circuit 2014 case called Wang, H-W-A-N-G versus Kansas State University that's at 735 F 3rd 1159 particularly at 1161 to 63 the Court explains that the EEO guidance manual at section 21 indicates that an employer doesn't have to retain an employee unable to perform her essential job functions for six months. And quoting from the guidance manual because six months is beyond a reasonable amount of time. You know, so here we have an employee that unquestionably no dispute of fact couldn't do her job for six months. And even that you know, the document that we received, there's no basis to believe she'd be able to show up in September or in the foreseeable future. It said indefinitely. So no reasonable jury could find that Ms. Minter was denied a reasonable accommodation because she, you know, didn't show up for six months and certainly not if the situation was that she wouldn't show up indefinitely which I think the evidence suggests here. Moreover, she never provided medical documentation supporting her need for an accommodation and per this Court's decision in Fleming versus Howard University which is cited by Ms. Minter in her reply at page 10 that's another reason that the accommodation claim fails. I see I'm running out of time. I'd briefly like to just correct a couple of things in the record in terms of the retaliation claim. Because I don't think there's any inconsistency in the positions taken in the district's summary judgment papers. We said given the reluctance of agency officials to terminate Ms. Minter even after she stopped coming to work and twice ignored her request to document her medical condition as well as the fact that she was not terminated as well as the fact that she was not I'm repeating myself, terminated until she informed her employee that she was totally disabled for working for an indefinite period of time and that termination thus occurred more than seven months after the December alleged protective activity. So it was all of these things. It wasn't merely that she didn't give a testimony as requested. And moreover, Ms. Fields did testify. She said, she was asked, did something come from Ms. Minter's doctor? And she testifies, and this is at page 282 of the appendix. She says something from Ms. Minter's doctor may have come, though she didn't see it because they limit who can see personal medical information. And she believed it may not have been enough. And there are two members of the they said they made this collaboratively or they certainly discussed it collaboratively. Ms. James, her supervisor, did see the certificate that said she was indefinitely and totally disabled. And she also testified that DCHR, which was a part of this collective group, had reviewed Ms. Minter's file and that disability certificate was in it. So it was all of these things that played a part in the decision that led to the letter terminating her employment. And I think there is also no temporal proximity here. Even if you measure it from June, it just doesn't make sense in these circumstances that temporal proximity, I mean, context matters, as the court has pointed out. They've waited for her for four months. And, you know, temporal proximity is meant to be some immediate action. Employers act while they're hot under the collar. Well, they'd already been waiting very patiently for four months. And a month and three quarters later is when the termination letter was sent. And that was after, three weeks later, they got the disability certificate. So, I think under this court's Talavera v. Shah case is relevant, where this court said positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine. And I think that's applicable here, and there's just no reasonable juror could find that the conflicts that they provide a basis for a jury to conclude that she was fired with retaliatory intent. If the court has no further questions, we would ask the court to affirm the district court's decision. Thank you for your attention. There are no further questions. Thank you. We'll give you two more minutes, even though you're out. Thank you, Your Honor. Just briefly, to turn to the discussion about the letter from the doctor, and the letter from the doctor showed she was indefinitely disabled. That letter came, as we've discussed, somewhat ad nauseum, July 24, 2007. The one failure to accommodate claim was December 1, 2006. I don't understand. Well, I guess there's an argument. You have an argument about that, but then there's the argument about whether that continued to be interactive. But then you say, in your reply to page 12, it makes sense that Ms. Mintner would not have raised the need for accommodation between December and June because she was on medical leave for most of that time, which obviously mooted her need for a modified schedule. So even if we were to say you were correct that that was the denial, wasn't it mooted at that point because she was on medical leave anyway? Well, Your Honor, the cause of action had already accrued. She already had the right because she had been denied. She's shown a prima facie case with respect to December 1 because she requested accommodation. She was denied. So these subsequent facts don't really alter her rights as to what happened on that date. The conduct that... Why do you want accommodation starting on the day at which the final, which the interactive process ended, right? Well, and there's a dispute of fact as to whether the interactive process continued with respect... Even if the interactive... This is maybe a slightly off-topic question, but still if you'll humor me for a minute. If the interactive process ended on that December date that you're talking about and she was denied an... Even if she was denied an accommodation on that date, but immediately thereafter she can't work because of... She's on medical leave. She's out, etc. What is the claim at that point? Well, hypothetically because those aren't our facts, but hypothetically there would still be the claim because that happened on that date. Once the district has denied the accommodation that's... The illegal activity has occurred. What's the damages or remedy? Imagine on December 1st, let's say there's complete, genuine good faith on both sides. They're trying to discuss not with your client, hypothetical plaintiff, whether the person can come in that day or can get an accommodation. And on that day they finally decide she can't. And the next day she dies, for whatever reason. Or even that day she dies. What is the nature of the claim? She has a right to an accommodation even if she does have a right to an accommodation. What's the nature of the claim when it's been mooted by her death? Your Honor, I'm not sure I know enough about what would happen if a person were to die in that scenario to fully address... But what if she definitely just cannot work? Cannot work starting on the day on which the accommodation was denied? I believe she would still be entitled to damages because there was an illegal activity. Her civil rights were violated in that she requested an accommodation. She showed she was a qualified individual with a disability. And in this scenario on the same day they said, no we're not going to give you that accommodation. And they didn't show that there would be an undue burden. And what would the damages be if they had granted the accommodation on that day she couldn't work anywhere because something happened? If they had granted it? Then I don't think there would be... What's the measure of damages here? I'm not sure right now, Your Honor. I'm not sure I can address that question. What's the measure of damages under either statute? Oh, you don't know. I'm not pressing you to start researching. Are there further questions? Okay, thank you. Thank you, Your Honor.
judges: Garland, Rogers, Edwards